(C. D. 724)

E. W. J. Hearty, Inc. *v.* United States

United States Customs Court, Third Division

(Decided January 27, 1943)

*Brooks & Brooks* (*Frederick W. Brooks* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before Cline, Keefe, and Ekwall, Judges

Keefe, Judge: This suit arising at the port of New York involves the dutiable weight of certain breasts of chicken, imported in tins from Poland, the tins bearing a label describing the contents as "chicken breasts—10 oz. avoir; broth and agar—6 oz. avoir; net weight 1 lb. avoir." Duty was assessed thereon at the specific rate of 10 cents per pound under paragraph 712 of the Tariff Act of 1930 on the basis of the net weight per tin, including all the juice, broth, and jelly. The importer claims that specific duty should have been assessed only upon the net weight of the chicken breasts, *per se*, and that the weight of the liquid or jelly should not have been included.

Paragraph 712 of the Tariff Act of 1930 provides in part as follows:

Par. 712. * * *: Chickens, * * * 10 cents per pound; * * *; all the foregoing, prepared or preserved in any manner and not specially provided for, 10 cents per pound.

Seven witnesses testified for the plaintiff, some of whom were commercial users of the product and other household consumers. It appears from such testimony that the merchandise was prepared by cooking chickens in plain water for approximately 5 minutes, if young, and for a longer period, if old; that the water in which the chickens are boiled is used three or four times and, after such use, the fat or grease coming to the top of the liquid is skimmed off, packed, and sold separately. The concentrated broth remaining in the kettle is also packed and sold as a separate item. After the chickens are taken

from the kettle they are cut into pieces, the breasts are removed and two halves are placed in each tin. They are then covered with hot "zalivka," hermetically sealed, and sterilized at 245° F. for 50 minutes or more, according to age. The tins are then removed from the retort, cooled and labeled. The "zalivka" placed in the tins is prepared with a mixture of cold water, salt, caramel, or burnt sugar, and one kilo of agar-agar. The agar-agar, when cooled, forms a solid mass of jelly and keeps the contents firm in the tins. The caramel is added to present a pleasing appearance to the consumer. After the chicken is boiled for 5 or 10 minutes the breasts are still hard but may be eaten. However, after sterilization, they are ready to serve. The sterilization process is employed to kill all the microbes and in order properly to perform that function it is necessary to sterilize for at least 50 minutes so that the center of the breasts may be reached. When the product is destined for shipment to countries having a warm climate the product is sterilized up to an hour and ten minutes. During the sterilization process some of the juices exude and become mixed with the "zalivka," although most of the juices were removed during the initial boiling process.

These witnesses further established that when a tin of chicken breasts is opened the jelly is removed, the best method of removal being to heat the can to liquefy the jelly so that it may be poured off. The jelly so removed is discarded as a use could not be found for it and such had always been the commercial practice. The witnesses were of the opinion that the jelly was not very palatable. Two manufacturers of chicken pies testified that in using the imported chicken breasts in the preparation of chicken pies the jelly was always discarded as it was found it changed the flavor of the pies. In an endeavor to overcome their loss in discarding the jelly, tests were made to find a use for it but they were unsuccessful; that chicken broth was made from freshly killed chickens and the jelly herein was not found suitable for that purpose. One manufacturer also produced chicken salads and creamed chicken as well as chicken pies and found that the jelly herein could not be used for any of their products because it did not have sufficient chicken flavor, nor could the flavor be stepped up with the use of intensifiers. A salesman who sold the imported merchandise to small restaurants endeavored by experiment to satisfy one of his customers that the jelly could be used in a chicken salad. The demonstration was unsuccessful, however, and the customer canceled his order because the price of the chicken breasts was too high.

Five chefs testifying for the defendant were of the opinion that the jelly contained in the cans of chicken breasts herein could be utilized. They were of the opinion that the jelly was actually chicken soup, or broth, or bouillon. None of the witnesses had ever used the product

in question, although some of them had used canned chicken produced in the United States. The broth found and used in canned chicken in their experience consisted of the chicken stock or broth remaining from the boiled chicken. One chef who was connected with a canning factory testified that they parboiled their chickens from 40 to 45 minutes because they needed a strong broth which was used in chicken soup and also put in the can with the chicken. All, however, were of the opinion that the jelly contained in the merchandise herein was just the same as any chicken broth.

The assistant director of Good Housekeeping Bureau experienced in testing food products testified that a product cooked in accordance with the method used in preparing the instant merchandise, would, in her opinion, result in a considerable flavoring exuding into the surrounding jelly and would have a food value; that such extractions drawn from meat or chicken would not be true proteins, although a chemical analysis would describe them as such; and that such extractions are a flavoring valuable for stimulating the lining of the stomach to produce gastric juices. The witness had made tests of chicken meat in tins produced in the United States but had no experience with the product before us.

The Government chemist testified that she had found 6 per centum of protein in the product as reported in her analysis (admitted in evidence as exhibit 2) and that such finding would indicate considerable water soluble nitrogenous material which she calculated as protein; and that qualitative tests made by her disclosed the presence of gelatin, and upon Government counsel's assertion that no gelatin had been added, the witness was of the opinion that the gelatin in the product must have come from the meat itself.

The importer's witnesses, all experienced in the use of the imported product as a consumer in the home or as a commercial consumer, were agreed that the liquid was discarded and no practical use could be found to satisfactorily utilize it, although it was admitted to have some food value. Government witnesses, on the other hand, were not experienced with the use of the imported product. It does not appear that they were experienced with products packed in agar-agar jelly, and generally seemed to confuse the jelly in the tins with soup stock, defined as a product resulting from the long, slow cooking of meat with bones, where such stock, after the removal of the fat, bones, and meat, becomes a jelly upon cooling and is variously used by chefs in the preparation of various foods for table use. See Century Cook Book. One of the Government witnesses admitted that there was no protein as such in the product, in her opinion, and that although the analysis calculated it as a protein, it was in fact only an extractive flavoring.

The plaintiff contends that a liquid or other substance surrounding

an article in a can for the purpose of preserving or protecting it, and which is generally discarded by the consumers of the article, is not part of the dutiable weight of the article, citing *Von Bremen, Asche, De Bruyn, Inc.* v. *United States*, T. D. 46643; *Von Bremen, Asche & Co.* v. *United States*, T. D. 44000; *Wa Chong Co.* v. *United States*, T. D. 45695; *Axel Stokby et al.* v. *United States*, C. D. 358; and *Lekas & Drivas* v. *United States*, Abstract 17106.

The Government contends that the gelatinous material in the cans consists in part of natural juices extracted from the chicken in the process of cooking; that such juices have a food value and are used and usable for a variety of purposes; and that the material is actually a form of chicken broth and as such properly included in the dutiable weight of the chicken, as an entirety. The Government further contends that the manner in which the imported article has been prepared warrants its classification as "chickens * * * prepared or preserved in any manner" and that duty was properly taken on the entire contents of the can. In support of such contention the Government relies upon the cases of *Dominion Canners, Ltd., et al.* v. *United States*, 12 Ct. Cust. Appls. 90, T. D. 40025; *International Forwarding Co.* v. *United States*, T. D. 43681; *Central Vermont Railway Co.* v. *United States*, T. D. 42459; *Geo. S. Bush & Co., Inc.* v. *United States*, Abstract 23587; and *United States* v. *Conkey & Co.*, 12 Ct. Cust. Appls. 552, T. D. 40783; and also the tomato paste cases, *Vitelli* v. *United States*, 28 C. C. P. A. 131, C. A. D. 134, and *Columbo & Co. et al.* v. *United States*, 21 C. C. P. A. 302, T. D. 46819.

Counsel for the Government further contends that even though the chicken and the gelatinous material may be considered as separate entities by the court the merchandise was nevertheless properly assessed by the collector because the packing material is actually chicken broth, a well-recognized article of commerce. The contents of the can, being chicken and chicken broth, a commingled merchandise, duty is properly assessable thereon at the rate applicable to the chicken under the provisions of section 508, relating to importations of commingled merchandise.

The decisions of the courts upon which the plaintiff relies seem to be directly in point. The *Von Bremen, Asche De Bruyn, Inc.*, case, *supra*, involved pimientos, packed in liquid in hermetically sealed tins. The merchandise was assessed at 6 cents per pound upon the weight of the contents under paragraph 775, act of 1930, "as pimientos * * * prepared or preserved in any manner." The importer contended that duty should have been taken upon the net weight of the pimientos only. The evidence established that the product was prepared by roasting, soaking in cold water, and removing the skins, seeds, and top of the pimientos. Thereafter the pimientos were packed in tins, being firmly pressed into the tins under pressure so

that the excess water in the pimientos either overflowed or was sealed into the tins. The tins were then sterilized and the water in the tins acted as a preservative and prevented the pimientos from breaking in transit. The testimony in that case was largely along the lines of the evidence produced here. The Government witnesses testified that the liquid found in the tins not only may be used but actually is used for culinary purposes and that such liquid has a food value. Laboratory experiments relative to the usefulness of the liquid in cooking and also as to the caloric value of the liquid showed there was not much difference between the food value of the liquid and that of the pimientos. The witnesses testifying for the importer were all experienced in the use of the imported merchandise and were agreed that the liquid was in practice always discarded. Chefs also testified that it was their practice to discard the liquid. The importer there contended that even though the liquid surrounding the pimientos may be capable of use, as a general practice it was not so used. Even though Government witnesses there had in some instances used the liquid contained in the canned pimientos in the preparation of food, the court was of the opinion that the weight of the testimony established that as a general practice it was not so used and it was held that duty should have been taken at 6 cents per pound upon the weight of the pimientos exclusive of the liquid contents.

In *Von Bremen, Asche & Co.* v. *United States, supra,* peas in tins were assessed at 2 cents per pound under paragraph 767 of the Tariff Act of 1922 as "peas, prepared or preserved" upon the weight of the contents of the tins. The plaintiff claimed that duty was only applicable to the weight of the peas, exclusive of the liquid. The testimony revealed that the peas were packed in water which contained negligible portions of salt and sugar and that such packing was necessary to protect the peas against injury, and that the water was poured off and thrown away as useless by the ultimate consumer. In sustaining the claim of plaintiff the court pointed out that the Tariff Act of 1922 omits the words "including the weight of the immediate containers" and provided only for an assessment of duty on the actual net weight of "peas, prepared or preserved in any manner," and that there was no provision of law assessing duty upon the weight of the water in the tins.

In *Wa Chong Co.* v. *United States, supra,* the merchandise consisted of ducks, which had been split, cleaned, dried, and packed in peanut oil in soldered tins. The collector assessed duty upon the entire weight of the contents of the tins under the provisions of paragraph 712 of the act of 1930, the provision under which duty was assessed in the case now before us. Upon evidence establishing that the ducks were so packed for preservation purposes only and that in commercial usage the oil was discarded although it did contain fats from the duck,

the court held that said ducks were dutiable upon the *per se* weight of the ducks, exclusive of the oil.

In *Lekas & Drivas* v. *United States, supra*, certain green' beans imported in tins were assessed at 2 cents per pound under paragraph 763, act of 1922, on the basis of the weight of the entire contents of the cans. There also it was claimed that duty was only assessable upon the weight of the beans and the liquid should not have been included. The evidence established that the water or juice in the tins was not used and that upon opening the tins the water was thrown out. There the beans were prepared by cutting both ends, cooking to a certain extent, placing in cans and adding salt water. The cans were hermetically sealed and then sterilized. The court held the beans were properly dutiable as "Beans, * * * prepared or preserved in any manner" at the rate of 2 cents per pound upon the net weight of the beans exclusive of the liquid.

In *Foo Lung & Co.* v. *United States*, 20 C. C. P. A. 316, T. D. 46088, certain sugar cane in its natural state was peeled, cut into lengths, then cooked by steaming and packed into cans with sugar and water. The cans were then hermetically sealed and in such condition imported. The importer claimed that the sugar cane was dutiable under paragraph 503 as "sugar cane in any other than its natural state" at the rate of 75 per centum of the rate of duty applicable to manufactured sugar of like polariscopic test. Upon consideration of the evidence establishing that upon opening the cans the juice was not used for any purpose and was of no value, the court held the sugar cane dutiable as claimed even though it had been also established that the average weight of the sugar in the liquid in each can was 1.15 ounces and polarized at the same degree as the sugar in the can.

In *Peabody* v. *United States*, 13 Ct. Cust. Appls. 80, T. D. 40935, the court held relative to canned pineapple that the water placed in tins with the fruit for the sole purpose of protecting it from damage was not, in the trade, use, or in fact, either a part or a natural impurity thereof, and held that duty should have been assessed at the specific rate upon the basis of the weight of the pineapple exclusive of the weight of the juice.

The case of *Stokby* v. *United States*, C. D. 358, involved certain hams, impregnated with a pickling solution and thereafter pressed into cans at which time such solution expelled from the pressed hams remains in the tins surrounding the meat, and has added thereto a wafer of agar-agar before hermetically sealing the tins and cooking for the required period. The agar-agar caused the juices exuding from the hams during the cooking process to form a jelly which swells so as to fill all the empty space in the tins. There also the jelly was found to contain a certain amount of protein. The judgment of the court, however, excluded the weight of the jelly from the dutiable weight of the hams.

A consideration of the cases cited by the Government in support of their contention that duty is properly assessable upon the contents of the tins as entireties, as chicken prepared or preserved in any manner, fails to show any application to the question presented in this case. In the *Dominion Canners* case, *supra*, certain apples were found to be preserved in their own juice, or partly in their own juice, and were held more specifically provided for as fruits preserved in their own juice, assessed at an ad valorem rate of duty, than under a provision for edible fruits prepared in any manner not specifically provided for, the latter provision bearing a specific rate of duty. In the *International Forwarding Co.* case, *supra*, certain blueberries were held dutiable at an ad valorem rate as "berries * * * otherwise prepared or preserved" rather than at a specific rate of duty as "berries * * * in their natural condition" when imported in tins. It was there contended that heating the berries in the tins to sterilize them and the packing in water in tins does not remove them from the class of berries in their natural condition. The court found the berries had been preserved and held them dutiable as such. In the *Central Vermont Railway Co.* case, *supra*, certain beef was assessed as dutiable at a specific rate applicable to fresh beef. The merchandise consisted of boneless, salted beef, and was claimed dutiable as meat, prepared or preserved, and dutiable at an ad valorem rate. The court found that the meat had been preserved and held it properly dutiable as claimed. In the *Conkey* case, *supra*, certain frozen lamb was held dutiable by similitude as fresh lamb at a specific rate of duty rather than dutiable at an ad valorem rate as preserved meat. Likewise the tomato paste cases of *Vitelli* and *Columbo*, *supra*, involved the specificity of respective paragraphs of the tariff law.

The *Bush* case, *supra*, relied upon by the Government as holding an article packed in a liquid in tins to be dutiable as an entirety was upon that point overruled in effect by the case of *Von Bremen, Asche, De Bruyn, Inc.*, *supra*, and the latter case will be followed by this court.

The weight of the evidence before us overwhelmingly supports plaintiff's contention that the 6 ounces of broth and agar contained in each can of chicken breasts is merely a packing material which in commercial practice is discarded upon opening the container; that it is not, in fact, chicken broth, and suitable for use as such, or for any other use.

In view of the evidence before us and following the decisions cited, we hold that duty should be taken at 10 cents per pound under paragraph 712 upon the basis of the weight of the chicken breasts exclusive of the weight of the broth and agar. Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entries and make refund accordingly.